# In the United States Court of Federal Claims

No. 09-108 T
(Filed October 8, 2013)[1]

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | * | |
| AMERGEN ENERGY CO., LLC, | * | Tax; Tax Equity and Fiscal |
| by and through EXELON | * | Responsibility Act of 1982 |
| GENERATION CO., LLC, tax | * | (TEFRA), 26 U.S.C. |
| matters partner, | * | §§ 6221-6234 (2006); |
| | * | Adjustment of Partnership Tax |
| Plaintiff, | * | Items; 26 U.S.C. §§ 461(h), |
| | * | 468A, 1012 (2006); Economic |
| v. | * | Performance Rule; Cost Bases of |
| | * | Acquired Nuclear Power Plants |
| THE UNITED STATES, | * | Do Not Include |
| | * | Decommissioning Liabilities. |
| Defendant. | * | |
| * * * * * * * * * * * * * * | * | |

*Terri L. Mascherin*, Chicago, IL, for plaintiff.  *John J. Hamill*, *Kaija K. Hupila*, *Hillary Guigue August*, Chicago, IL, of counsel.

*Cory A. Johnson*, United States Department of Justice Tax Division, with whom were *Kathryn Keneally*, Assistant Attorney General, *David I. Pincus*, Chief, Court of Federal Claims Section, *Mary M. Abate*, Assistant Chief, *S. Starling Marshall*, Trial Attorney, Washington, DC, for defendant.

_____

## OPINION AND ORDER

_____

[1]/ This opinion was issued under seal on September 17, 2013.  Pursuant to ¶ 4 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. The parties notified the court that no redactions were necessary.  Thus, the sealed and public versions of this opinion are identical, except for the publication date and this footnote.

**Bush**, *Judge*.

This case is before the court on cross-motions for summary judgment as to Counts I-IV of the complaint, filed under Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). Count V, the only other count in the complaint, has been the subject of successful settlement negotiations. For the reasons stated below, defendant's motion for summary judgment is granted and plaintiff's motion for summary judgment is denied.

## BACKGROUND

### I.    Relevant Facts

### A.    Overview

This is a readjustment of partnership items case under the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), codified at 26 U.S.C. §§ 6221-6234 (2006). Plaintiff is AmerGen Energy Company, LLC (AmerGen), by and through Exelon Generation Company, LLC, AmerGen's tax matters partner. AmerGen purchased three nuclear power plants and took over their operation in 1999-2000.[2] Compl. ¶¶ 1, 25, 30, 36-37, 43-44, 50; Pl.'s Mot. at 5. The sole issue before the court is the proper tax treatment of any decommissioning liabilities for the nuclear power plants that were assumed by AmerGen at the time of purchase. For this reason, the court limits its recitation of facts to those which provide a sufficient context for the parties' arguments. These facts are undisputed unless otherwise noted.

As a threshold issue, the court observes that plaintiff's use of the term "decommissioning liabilities," for the purposes of its tax claims for tax years 2001, 2002, and 2003, Compl. ¶¶ 18, 20, 23, is broader than that of federal regulators who oversee the decommissioning process. *See* 10 C.F.R. § 50.2 (2013) (providing the regulatory definition of the decommissioning process). As plaintiff

---

[2]  The entity AmerGen no longer exists. Compl. ¶ 7. The court comprehensively refers to the partners, purchasing partnership, power plants operator, taxpayer and litigant in this case as AmerGen, even though other, related business entities have fulfilled some of these roles at various times.

notes, the Nuclear Regulatory Commission (NRC) does not include the management of spent nuclear fuel at a nuclear power plant as part of its regulatory definition of decommissioning; plaintiff nevertheless includes the costs of spent nuclear fuel storage and management in its decommissioning liability calculations. Pl.'s Mot. at 8 (stating that "'decommissioning' as used in [plaintiff's] brief and the industry includes additional components"). Plaintiff also includes certain site restoration expense estimates in its calculation of "decommissioning liabilities," even though, according to plaintiff, such expenditures are often required by state or local governments and not by the decommissioning process imposed by the NRC. Pl.'s Mot. at 9. Thus, these "additional components" of decommissioning liabilities claimed by plaintiffs, *id.* at 8, are not among the decommissioning requirements imposed by the NRC, Pl.'s Ex. 8 at 315-16.

Defendant contends, therefore, that some of the expenses attributed by plaintiff to decommissioning liabilities are *not* properly characterized as decommissioning costs. Def.'s Mot. at 4 n.5. Plaintiff acknowledges the distinction between the NRC's definition of decommissioning and plaintiff's use of the term. Pl.'s Mot. at 11; Pl.'s Reply at 9. Interestingly, both plaintiff and defendant suggest that the controversy over terminology is not particularly crucial to their view of the case. From plaintiff's perspective, liabilities are liabilities, regardless of how these liabilities are imposed. Pl.'s Mot. at 8 n.4. In defendant's view, the Internal Revenue Code (IRC)[3] denies favorable tax treatment to all of plaintiff's asserted liabilities, whether or not these are properly termed decommissioning liabilities. Def.'s Mot. at 4 n.5.

The court agrees with the parties that plaintiff's somewhat imprecise usage of the term "decommissioning liabilities" is largely irrelevant to the court's resolution of the parties' cross-motions. Thus, for the purposes of this opinion, the terms "decommissioning liabilities" and "decommissioning costs" encompass decommissioning required by the NRC, spent nuclear fuel management and site

---

[3]/ Unless otherwise specified, all references to the Internal Revenue Code (IRC or Code) point to the current 2006 version of Title 26 of the United States Code. The parties have not noted any material variance between the current version of the Code and Code sections in effect during tax years 2001, 2002 and 2003. *See* Pl.'s Mot. at 2 n.2; Def.'s Mot. at 3 n.2. As far as Treasury Regulations are concerned, the court relies generally on the version that was in effect at the time AmerGen acquired the nuclear power plants and during the tax years at issue in this suit.

3

restoration expenses.[4]  The court notes, however, that one cannot assume that the IRC has adopted plaintiff's definition of decommissioning, rather than the NRC's definition, in sections such as § 468A, which is titled "Special rules for nuclear decommissioning costs."

### B.     The Three Nuclear Power Plant Purchases

### 1.     Three Mile Island Unit 1 Nuclear Generating Station

AmerGen purchased the Three Mile Island Unit 1 Nuclear Generating Station (TMI-1), located near Harrisburg, Pennsylvania, in December 1999. Compl. ¶ 30; Pl.'s Mot. at 5.  "AmerGen agreed to pay $23,000,000 in cash for TMI-l and related assets, as well as $77,267,000 in five annual installments of $15,453,400 for the nuclear fuel in TMI-1's reactor."  Compl. ¶ 34.  The court notes that according to these figures in the complaint, the "cost basis"[5] of TMI-1 might be assumed to consist of around $100,267,000 in cash.[6]

According to plaintiff, however, AmerGen also assumed at least $534,387,312 (in 1999 dollars) of decommissioning liabilities at the time for TMI-1.  *Id.* ¶ 35.  If such decommissioning liabilities are included in the cost basis, one then might assume that the cost basis of TMI-1 would include both the $100,267,000 in cash paid by AmerGen and $534,387,312 in decommissioning liabilities.  Thus, if plaintiff's view of the IRC is correct, decommissioning liabilities might inflate the cost basis for TMI-1 from around $100,267,000 to approximately $634,650,000.

Finally, as part of the purchase of TMI-1, AmerGen received from the seller

---

[4]/  According to plaintiff, the "vast bulk of decommissioning liabilities [asserted in plaintiff's tax claim] are in the radiological category" of decommissioning activities required by the NRC.  Pl.'s Reply at 9 n.6.

[5]/  The court will discuss the term "cost basis" in greater detail in the analysis section of this opinion.  As plaintiff explains the term, "cost basis" describes the cost to the taxpayer of a purchased asset.  Pl.'s Mot. at 19.

[6]/  The court provides this figure, and other figures in the discussion of cost basis calculations for the three nuclear power plant purchases described in this background section of the opinion, for illustrative purposes only.

two funds of marketable securities that are described by plaintiff as "decommissioning trust funds." Pl.'s Mot. at 6. One fund is a "qualified" fund, the other is a "non-qualified" fund.[7] For TMI-1, at the time of purchase the qualified fund was valued at $132,934,830 and the non-qualified fund was valued at $168,667,515. *Id.* "AmerGen had required the seller[] to increase the trust fund amounts to ensure that sufficient funding would be available to meet regulatory requirements for decommissioning." *Id.* The parties dispute whether plaintiff has properly accounted for certain monies in the decommissioning trust funds in its estimate of decommissioning liabilities, but this dispute is not material to the resolution of the parties' cross-motions. *See* Def.'s Reply at 6-7, 39-41, 45; Pl.'s Reply at 39-41.

### 2.    Clinton Power Station

AmerGen also purchased the Clinton Power Station (Clinton), located in DeWitt County, Illinois, in December 1999. Compl. ¶ 37; Pl.'s Mot. at 5. "AmerGen agreed to pay $20,000,000 in cash, with provisions for adjustments to be made at closing, for Clinton and related assets." Compl. ¶ 41. The court notes that according to this figure in the complaint, the cost basis of Clinton might be calculated at approximately $20,000,000 in cash.

According to plaintiff, however, AmerGen also assumed at least $602,251,770 (in 1999 dollars) of decommissioning liabilities at the time for Clinton. *Id.* ¶ 42. If such decommissioning liabilities are included in the cost basis, one then might assume that the cost basis of Clinton would include both the $20,000,000 in cash paid by AmerGen and $602,251,770 in decommissioning liabilities. Thus, if plaintiff's view of the IRC is correct, decommissioning liabilities might inflate the cost basis for Clinton from around $20,000,000 to approximately $622,251,770.

Finally, as part of the purchase of Clinton, AmerGen received from the seller two funds of marketable securities that are described by plaintiff as decommissioning trust funds. Pl.'s Mot. at 6. One fund is a qualified fund, the other is a non-qualified fund. For Clinton, at the time of purchase the qualified

---

[7]/ The difference between "qualified" and "non-qualified" decommissioning funds is not relevant to the resolution of the parties' cross-motions.

fund was valued at $85,870,204 and the non-qualified fund was valued at $149,452,580 (including $25 million in post-closing contributions). *Id.* "AmerGen had required the seller[] to increase the trust fund amounts to ensure that sufficient funding would be available to meet regulatory requirements for decommissioning." *Id.* The parties dispute whether plaintiff has properly accounted for certain monies in the decommissioning trust funds in its estimate of decommissioning liabilities, but this dispute is not material to the resolution of the parties' cross-motions. *See* Def.'s Reply at 6-7, 39-41, 45; Pl.'s Reply at 39-41.

### 3.    Oyster Creek Nuclear Generating Station

AmerGen purchased the Oyster Creek Nuclear Generating Station (Oyster Creek), located in New Jersey, in August 2000. Compl. ¶ 44; Pl.'s Mot. at 5. "AmerGen agreed to pay . . . $10,000,000 in cash for Oyster Creek and related assets, subject to certain price adjustments." Compl. ¶ 48. The court notes that according to this figure in the complaint, the cost basis of Oyster Creek might be calculated to be approximately $10,000,000 in cash.

According to plaintiff, however, AmerGen also assumed at least $550,751,044 (in 2000 dollars) of decommissioning liabilities at the time for Oyster Creek. *Id.* ¶ 49. If such decommissioning liabilities are included in the cost basis, one then might assume that the cost basis of Oyster Creek would include both the $10,000,000 in cash paid by AmerGen and $550,751,044 in decommissioning liabilities. Thus, if plaintiff's view of the IRC is correct, decommissioning liabilities might inflate the cost basis for Oyster Creek from approximately $10,000,000 to around $560,751,044.

Finally, as part of the purchase of Oyster Creek, AmerGen received from the seller two funds of marketable securities that are described by plaintiff as decommissioning trust funds. Pl.'s Mot. at 6. One fund is a qualified fund, the other is a non-qualified fund. For Oyster Creek, at the time of purchase the qualified fund was valued at $174,158,564 and the non-qualified fund was valued at $263,312,382. *Id.* "AmerGen had required the seller[] to increase the trust fund amounts to ensure that sufficient funding would be available to meet regulatory requirements for decommissioning." *Id.* The parties dispute whether plaintiff has properly accounted for certain monies in the decommissioning trust funds in its estimate of decommissioning liabilities, but this dispute is not material to the resolution of the parties' cross-motions. *See* Def.'s Reply at 6-7, 39-41, 45; Pl.'s

Reply at 39-41.

### 4.    Total Alleged Decommissioning Costs

Plaintiff states that "[i]n each [nuclear power plant acquisition], AmerGen paid a relatively modest amount of cash and assumed the sellers' decommissioning liabilities." Pl.'s Mot. at 5. The court agrees that AmerGen's cash payments are indeed modest when compared to the decommissioning liabilities that are alleged to have been assumed by plaintiff at the time of purchase. The cash payments for the three plants, according to plaintiff, totaled only $93,297,957, whereas the total decommissioning liabilities totaled $1,687,390,126. *Id.* at 6. If plaintiff is correct in its interpretation of the tax laws, AmerGen might be able to reap the tax benefits of cost bases (consisting of cash payments *and* decommissioning liabilities) approximately nineteen times the amount of the cost bases that might otherwise be derived from the cash payments provided by plaintiff to acquire the three nuclear power plants.

### C.    AmerGen's Requests for Favorable Tax Treatment of Decommissioning Costs

There is a long history of AmerGen's efforts to obtain favorable tax treatment of decommissioning costs in its purchase of the three nuclear power plants. Only a brief summary of this history is required here. It is undisputed that accounting and legal advisors consulted by AmerGen warned plaintiff that the Internal Revenue Service (IRS) would not likely allow decommissioning costs to be counted in the cost bases of the plants. Def.'s Mot. at 9-10 (citing Def.'s Ex. 23 at 1083, Ex. 24 at 1099-1100); Pl.'s Mot. at 16.

When negotiating the purchases, AmerGen also sought Private Letter Rulings from the IRS on this issue, and was repeatedly informed that decommissioning liabilities could not be included in the cost bases of the plants. Pl.'s Mot. at 16. Plaintiff asserts that AmerGen attempted to follow the advice obtained from the IRS when completing its 2001-03 tax returns, but its tax returns nonetheless "reflected the inclusion of a portion of the assumed decommissioning liabilities in the bases of the acquired assets." Compl. ¶¶ 63-64. Eventually, through a combination of audit procedures and amended returns, "AmerGen claimed depreciation and amortization deductions and reduced the amount of capital gain recognized on sales of securities, all based on revised cost basis

calculations reflecting the inclusion of the assumed decommissioning liabilities." Pl.'s Mot. at 16.

The IRS disallowed the favorable tax treatment sought by AmerGen and issued three notices of Final Partnership Administrative Adjustment (FPAAs) to that effect for tax years 2001, 2002 and 2003.  Compl. ¶ 10; Pl.'s Mot. at 17. AmerGen asserts that it deposited the requisite amount, $2,899,564.49, with the IRS in response to the FPAAs on February 19, 2009.  Compl. ¶ 14.  AmerGen then filed this lawsuit in order to obtain favorable tax treatment of the decommissioning liabilities it assumed in the purchase of the three nuclear power plants.

## II.    Procedural History

AmerGen filed its complaint on February 20, 2009.  The four counts of the complaint relevant to the parties' cross-motions are all premised on obtaining the inclusion of decommissioning liabilities in the cost bases of the referenced nuclear power plants.  The primary thrust of plaintiff's claims is that the decommissioning costs it assumed, "estimated at $1.687 billion using ubiquitously accepted methodologies," should be included in the cost bases of the plants.  Pl.'s Mot. at 2; *see also* Compl. ¶¶ 18, 20, 23.  As a fall-back position, plaintiff asserts that there is a minimum regulatory requirement for decommissioning funds that "sets a floor for the amount of AmerGen's assumed obligations."  Pl.'s Mot. at 25.  That figure, to be included in the plants' cost bases, is $950,250,000, according to plaintiff.

The first four counts of the complaint articulate specific benefits of the favorable tax treatment sought by AmerGen, as that favorable treatment of decommissioning liabilities would impact tax years 2001, 2002 and 2003.[8] Plaintiff's motion presents this shorthand summary of Counts I-IV of the complaint:

> On Count I, for the taxable year 2001, AmerGen's depreciation expense should be decreased by the net amount of $1,366,777.  For the taxable year 2002,

---

[8]/   Defendant asserts that plaintiff, if successful in its suit before this court, would reap tax benefits for many tax years, not just for tax years 2001-03.  Def.'s Mot. at 13-14.  According to defendant, AmerGen would claim hundreds of millions of dollars in additional deductions derived from the increase in the cost bases of the three nuclear power plants.  *Id.* at 14.

> AmerGen is entitled to an increase in its depreciation
> expense deduction in the amount of $13,991,339.  For the
> taxable year 2003, AmerGen is entitled to an increase in
> its depreciation expense deduction in the amount of
> $8,983,881.
>
> On Count II, for each of the taxable years 2001-03,
> AmerGen is entitled to a deduction for amortization of
> goodwill in an amount not less than $71,885,477.
>
> On Count III, AmerGen's decommissioning capital gains
> on sales of decommissioning fund assets should be
> decreased by the amounts of $64,475,357 (for 2001),
> $8,755,733 (for 2002), and $13,434,270 (for 2003).
>
> On Count IV, AmerGen's deductions should be increased
> by the amounts of $1,436,091 (2001), $4,163,115 (2002),
> and $4,374,127 (2003).

Pl.'s Mot. at 47-48.  As both parties acknowledge, the threshold issue of whether
AmerGen may include decommissioning liabilities in the cost bases of the nuclear
power plants is the dispositive issue for their cross-motions for summary judgment.
Def.'s Mot. at 23; Pl.'s Mot. at 1-2, 47-48 & n.16.

The parties' cross-motions for summary judgment on the claims in Counts
I-IV have been exhaustively briefed.  The parties' motions present appropriate
legal authority and well-crafted legal argument.  Oral argument was neither
requested by the parties nor deemed useful by the court.

## III.   Recent Developments

None of the three nuclear power plants purchased by AmerGen in 1999 or
2000 has been decommissioned.  The license for Oyster Creek, originally set to
expire in 2009, has been extended for another twenty years.  Def.'s Mot. at 6 &
n.6.  The license for TMI-1, originally set to expire in 2014, has also been extended
for another twenty years.  *Id.*  Clinton's license will not expire until 2026, and may
be extended for another twenty years after that.  *Id.*  According to defendant, the
decommissioning process may extend for as much as sixty years after operation of

a nuclear power plant ends. *Id.* at 6 (citing 10 C.F.R. § 50.82(a)(3) (2013)). Thus, the decommissioning liabilities at issue in plaintiff's tax suit might not be fully incurred until the year 2106.

As to spent nuclear fuel management costs at the three nuclear power plants purchased by AmerGen in 1999 and 2000, AmerGen filed one suit in 2004 against the United States for spent nuclear fuel management costs which subsequently settled. Def.'s Reply at 56 & n.30. It is unclear how this settlement and further litigation might affect the decommissioning liabilities asserted by plaintiff in this suit. Defendant asserts that such litigation calls into question at least some of plaintiff's estimates as to the amount of its decommissioning liabilities. *Id.* at 56-57. Such concerns, however, are not material to the resolution of the cross-motions before the court.

## DISCUSSION

## I.   Standard of Review

"[S]ummary judgment is a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987) (internal quotations and citations omitted). The party moving for summary judgment will prevail "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). Cross-motions for summary judgment "are not an admission that no material facts remain at issue." *Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed. Cir. 1997) (citing *United States v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir. 1978)). The parties may focus on different legal principles and allege as undisputed a different set of facts. *Id.* "Each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts." *Id.*

A genuine issue of material fact is one that could "affect the outcome" of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Liberty Lobby*). "The moving party . . . need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case." *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994)

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  A summary judgment motion is properly granted against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case and for which that party bears the burden of proof at trial.  *Celotex*, 477 U.S. at 324.

The United States Supreme Court has instructed that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Liberty Lobby*, 477 U.S. at 247-48.  A nonmovant will not defeat a motion for summary judgment "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citation omitted).  "A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." *Dairyland*, 16 F.3d at 1202 (citing *Celotex*, 477 U.S. at 323).

Plaintiff bears the burden to show that it is entitled to the adjustments to partnership tax items it seeks in this suit.  *E.g.*, *Stobie Creek Invs., LLC v. United States*, 82 Fed. Cl. 636, 663-64 (2008), *aff'd*, 608 F.3d 1366 (Fed. Cir. 2010); *Transpac Drilling Venture, 1983-2 by Dobbins v. United States*, 32 Fed. Cl. 810, 820 (1995) (citing *Welch v. Helvering*, 290 U.S. 111, 115 (1933)), *aff'd*, 83 F.3d 1410 (Fed. Cir. 1996).

## II.    Analysis

### A.    Cost Basis

Defendant's moving brief presents a coherent overview of the tax treatment of asset acquisitions.  *See* Def.'s Mot. at 14-17.  Plaintiff's approach to the topic of the tax treatment of asset acquisitions is less general; its moving brief focuses instead on particular aspects of asset acquisitions and one section of the IRC.  *See* Pl.'s Mot. at 19-20 & n.9, 26-27.  The court credits defendant's overview of relevant tax principles, which is largely unchallenged by plaintiff,[9] and reproduces

---

[9]/  Plaintiff appears to argue that the capitalization requirement in 26 U.S.C. § 263 (2006) has no relationship to the determination of the cost basis of a purchased asset pursuant to 26

continue...

certain salient points here:

> Generally, when a taxpayer purchases property that has a useful life beyond the taxable year of purchase (such as a nuclear power plant), it cannot simply deduct the amount it paid for the property.  Instead, the cost is capitalized, and determines the basis of the property.  *See* [IRC] §§ 263, 1012; Treas. Regs. §§ 1.263(a)-1 (as amended in 1992); 1.263(a)-2 (as amended in 1987).  The cost (and thus the tax basis) is the amount paid for the asset in cash or other property.  Treas. Reg. § 1.1012-1(a) (as amended in 1996).

Def.'s Mot. at 15-16.  There is no dispute that the "taxpayer's [cost] basis in purchased property is the property's cost."  Pl.'s Mot. at 19.

There is also no dispute that cost basis may be increased over the years to reflect the adjusted cost basis of an asset:

> [A] taxpayer may allocate an initial amount to basis as of the year of acquisition, but also may be required to allocate an additional amount in another, later tax year, when those additional amounts are incurred and properly taken into account for tax purposes.  For example, if a taxpayer buys a business in year 1, and pays $100 at that time, that amount could be allocated to the assets' bases

---

⁹/ ...continue

U.S.C. § 1012 (2006).  *See* Pl.'s Mot. at 26-27, 31-32; Pl.'s Reply at 33-36.  Numerous authorities, however, support defendant's premise that the costs of nuclear power plants that are acquired are capitalized and that these capitalized costs determine the cost bases for the plants. *See, e.g.*, *Woodward v. Comm'r*, 397 U.S. 572, 574-76 (1970) (stating that "capital expenditures . . . are added to the basis of the capital asset with respect to which they are incurred" and that "'(t)he cost of acquisition . . . of . . . property having a useful life substantially beyond the taxable year' is a capital expenditure" (citing § 263 and quoting Treas. Reg. § 1.263(a)-2(a))); *Cruttenden v. Comm'r*, 644 F.2d 1368, 1372-73 (9th Cir. 1981) (noting the connection between capitalization rules in Treas. Reg. § 1.263(a)-2 and cost basis).  The court therefore must reject plaintiff's contention that § 263 and its implementing regulations are irrelevant to the determination of cost basis under § 1012.

in year 1.  If in year 5 an additional $50 is incurred and
properly taken into account as an amount treated as an
additional cost for the assets, that amount is then added to
basis in year 5.  Treas. Reg. § 1.1060-1T(f), (g) (1988).

Def.'s Mot. at 17 (footnote omitted).  As plaintiff notes, capital costs "ultimately
becom[e] part of adjusted basis under [IRC] § 1011."  Pl.'s Reply at 33.  After
acquisition, capital expenditures "will be added to adjusted basis at the appropriate
time."  *Id.*

Finally, there is no dispute that certain assumed liabilities are also included
in the cost basis of a purchased asset.  According to defendant, "[u]nder certain
circumstances, liabilities assumed in connection with the acquisition of capital
assets may be included as a component of the cost, and added to the basis of the
property acquired."  Def.'s Mot. at 16 (citations omitted).  According to plaintiff,
"[w]hen a taxpayer acquires property encumbered by non-contingent liabilities that
the taxpayer assumes, . . . the non-contingent liabilities are included as part of the
taxpayer's [cost] basis for that property."  Pl.'s Mot. at 1-2.  Although plaintiff
prefers the term non-contingent liabilities, defendant describes such liabilities as
liabilities which have been incurred:  "Once a liability . . . is properly incurred and
eligible to be taken into account for tax purposes, it is taken into account as a
deduction, as part of cost basis, or in some other manner pursuant to other
applicable Code provisions."  Def.'s Mot. at 19.  Both of these formulations are
appropriate and capture the essence of the inquiry.[10]  Because defendant's
phraseology better reflects statutory and regulatory terms discussed *infra*, the court
generally utilizes such terms and will determine in this opinion whether AmerGen
has shown that its assumed decommissioning liabilities were incurred at the time of
the purchase of the three nuclear power plants.

## B.    Section 1012

Plaintiff insists that only one section of the IRC is determinative of the cost
bases of acquired assets such as nuclear power plants.  The sole relevant Code
section, according to plaintiff, is § 1012.  *See, e.g.*, Pl.'s Mot. at 1 ("This case is

---

[10]/  Courts use these concepts (incurred/not incurred; non-contingent/contingent)
interchangeably in this context.  *See, e.g.*, *United States v. Hughes Props., Inc.*, 476 U.S. 593,
600 (1986); *Transamerica Corp. v. United States*, 999 F.2d 1362, 1367-68 (Fed. Cir. 1993).

about § 1012 basis . . . ."), 1-2 (stating that "§ 1012 establishes that the non-contingent liabilities are included as part of the taxpayer's § 1012 basis for that property"), 19 ("26 U.S.C. § 1012(a) sets forth the basis rules of 'general application' and provides that '[t]he basis of property shall be the cost of such property.'" ), 26 ("This case is about § 1012 basis, not the timing of deductions."), 27 ("The key issue here is the application of § 1012, which compels judgment for AmerGen."), 28 ("The Code has a specific provision – § 1012 – that sets forth how basis for a purchase is calculated."), 28 ("[T]he Code's text and structure are clear that the accounting and deduction rules have nothing to do with the calculation of § 1012 basis."); *see also* Pl.'s Reply at 33 (stating that IRC "§ 263 has no bearing on this dispute because it relates to the availability of certain types of deductions and has nothing to do with including assumed liabilities in § 1012 basis"), 35 ("Purchase price basis is set by § 1012 . . . ."). Plaintiff's oft-repeated mantra, that § 1012 compels a certain (favorable) treatment of assumed liabilities, would be far more persuasive if the text of § 1012 included even a passing reference to liabilities, but it does not. The relevant text of § 1012 states, quite simply, that "[t]he basis of property shall be the cost of such property." 26 U.S.C. § 1012(a). This statutory text cannot be read to provide the exclusive means for determining whether or not an assumed liability should be included in the cost basis of an acquired asset.

Plaintiff, in fact, concedes that another rule of law, separate and distinct from the one found in § 1012, must be used to complement the simple and unadorned cost basis definition set forth in § 1012:

> There is no specifically articulated test to determine whether a liability is non-contingent, but courts have borrowed from other aspects of the Code to discern whether a liability is non-contingent.

Pl.'s Mot. at 20; *see also* Pl.'s Reply at 3, 22, 24, 26-27 & n.13 (noting that a "borrowed" test permits the calculation of cost basis under § 1012 if the acquired asset purchase includes non-contingent liabilities). The court therefore finds that this dispute is *not* resolved by a straightforward and exclusive application of the text of § 1012; the parties and the court agree that another rule of law must be applied to determine whether or not AmerGen incurred decommissioning liabilities at the time of its purchase of the three nuclear power plants. Defendant argues that the appropriate rule of law is found in IRC § 461(h), to which the court now turns.

### C.    Section 461(h)

#### 1.    Origins of the "All Events" Test

"The 'all events' test is used to determine when a business expense has been incurred for tax purposes."  *In re Harvard Indus., Inc.*, 568 F.3d 444, 450 n.7 (3d Cir. 2009) (citing 26 U.S.C. § 461(h)(4); *United States v. Anderson*, 269 U.S. 422, 441 (1926)).  The all events test sprang from this statement in *Anderson*:  "[I]n advance of the assessment of a tax, all the events may occur which fix the amount of the tax and determine the liability of the taxpayer to pay it."  269 U.S. at 441; *see United States v. Gen. Dynamics Corp.*, 481 U.S. 239, 242 (1987) (*General Dynamics*) (noting that the all events test originated in *Anderson* (citing *United States v. Hughes Props., Inc.*, 476 U.S. 593, 600 (1986) (*Hughes Properties*))). Until the mid-1980s, it is clear that the all events test consisted of two prongs which were satisfied if all events had occurred so as to make an expense or liability of the taxpayer fixed and determinable:

> First, all the events must have occurred which establish the fact of the liability.  Second, the amount must be capable of being determined "with reasonable accuracy."

*Hughes Properties*, 476 U.S. at 600 (quoting Treas. Reg. § 1.446-1(c)(1)(ii) (1985)); *see* Treas. Reg. § 1.461-1(a)(2) (1967) (stating that "an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy").  Although plaintiff prefers to refer to the two-prong all events test, as it is applies to liabilities that may be included in cost basis, as the "fixed" and "determinable" test, Pl.'s Mot. at 20; Pl.'s Reply at 3, 22, 24, 26-27 & n.13, the court has found no meaningful distinction between the two-prong all events test and plaintiff's "fixed" and "determinable" test.

#### 2.    Congress Added a Third Prong to the All Events Test by Adding Section 461(h) to Section 461 in 1984

In 1984, Congress added a third prong to the all events test, adding a requirement that economic performance of a liability must occur before the liability can be accounted for as an incurred liability:

> The "all events" test has been incorporated into the
> Internal Revenue Code by the Deficit Reduction Act of
> 1984, Pub. L. 98-369, 98 Stat. 598, 60[0], 26 U.S.C.
> § 461(h)(4) (1982 ed., Supp. III).  Section 461(h)
> imposed limits on the application of the test, providing
> that "in determining whether an amount has been
> incurred with respect to any item during any taxable year,
> the all events test shall not be treated as met any earlier
> than when economic performance with respect to such
> item occurs." § 461(h)(1).  The pertinent portions of the
> 1984 amendments were retained in the Tax Reform Act
> of 1986.

*General Dynamics*, 481 U.S. at 243 n.3.  The two-prong all events test was not present in the Code prior to 1984 – all three prongs of the new three-prong all events test were added to the Code in 1984 by the addition of § 461(h) to § 461. *See* Pub. L. 98-369, Div. A, Title I, § 91(a), 98 Stat. 494, 598-600 (1984).[11]  As the United States Supreme Court noted in *General Dynamics*, since 1984 the "economic performance" requirement, the third prong of the modern three-prong all events test, altered the application of the two-prong all events test that had existed up until that time.  481 U.S. at 243 n.3.

The modern three-prong all events test is found in two distinct portions of § 461(h).  The first two prongs of the three-prong all events test, which carry forth the basic principles of the traditional two-prong all events test, are stated in § 461(h)(4):

> *All events test*  For purposes of this subsection, the all
> events test is met with respect to any item if all events
> have occurred which determine the fact of liability and
> the amount of such liability can be determined with
> reasonable accuracy.

26 U.S.C. § 461(h)(4).  The third prong of the three-prong all events test is found

---

[11]/  The "[s]pecial rules for nuclear decommissioning costs," 26 U.S.C. § 468A, briefly discussed *infra*, were added to the Code at the same time.  *See* Pub. L. 98-369, Div. A, Title I, § 91(c), 98 Stat. 494, 604-06 (1984).

in § 461(h)(1):

> *In general*  For purposes of this title, in determining
> whether an amount has been incurred with respect to any
> item during any taxable year, the all events test shall not
> be treated as met any earlier than when economic
> performance with respect to such item occurs.

26 U.S.C. § 461(h)(1).  The title of subsection (h) is "Certain liabilities not
incurred before economic performance," and the title of IRC § 461 is "General rule
for taxable year of deduction."

As the statutory text demonstrates and plaintiff concedes, the modern all
events test, since 1984, includes a third prong, a requirement that "the all events
test shall not be treated as met any earlier than when economic performance with
respect to such item occurs."  IRC § 461(h)(1); Pl.'s Mot. at 20 n.9.  Plaintiff's
position, however, is that "[c]ourts borrow the 'fixed' and 'determinable' test to
determine whether liabilities are non-contingent and therefore part of § 1012
basis," rather than the modern three-prong all events test set forth in § 461(h)(1),
(4).  Pl.'s Reply at 3; *see also* Pl.'s Mot. at 20 n.9 ("[T]he full 'all events' test for
deductibility [found in § 461(h)(1), (4)] includes other inquiries, beyond 'fixed'
and 'determinable' (including whether economic performance has occurred), that
do not affect whether a liability is non-contingent.").  In essence, plaintiff's
arguments concerning the correct test for cost basis boil down to a determined, but
ultimately, unsuccessful effort to circumvent the third prong of the three-prong all
events test.

To restate plaintiff's position, although the modern three-prong all events
test applies to other tax scenarios, a two-prong all events test remains the
appropriate test for determining the cost basis of a purchased asset.  On the other
hand, defendant's position, simply stated, is that since 1984 the three-prong all
events test has governed the incurred liability question in determining cost basis.
Each party asserts that the plain text of the relevant statutes supports its position on
this issue.[12]  The court has considered all of the parties' arguments, and will discuss

---

[12]/  As plaintiff points out, defendant also relies on regulatory interpretation of Code
sections, as will be discussed *infra*.  Pl.'s Mot. at 34 ("The government largely ignores the Code.
continue...

the parties' most substantive arguments here regarding the three-prong all events test set forth in § 461(h)(1), (4).

### 3.    Plain Text Arguments

The court's analysis of § 461(h) begins with the text of the statute, as it must.  Defendant relies on at least two arguments that are squarely based, in the court's view, on the plain text of the Code.  The first is that "according to its plain language, § 461(h) applies generally to determine when 'liabilities' are incurred, and when those liabilities are taken into account as either cost items that create tax basis or as expense items that are currently deductible."  Def.'s Reply at 5 (citations omitted).  The second argument is that when Congress simultaneously enacted § 461(h) and § 468A, from that point on decommissioning costs for nuclear power plants could be accounted for in two different ways:

> [P]ursuant to the coordinated scheme enacted by Congress in 1984, § 468A(a) and § 461(h) are the two alternative means for taxpayers to take into account future decommissioning liabilities.  And, if a taxpayer does not elect to follow the rules of § 468A and claim the current deductions [for monies set aside in a qualified fund for decommissioning costs] that those rules allow, it is subject to the otherwise generally applicable rules of § 461(h), and must wait for economic performance before taking into account alleged decommissioning liabilities.

Def.'s Mot. at 31 (citation omitted).  The court will discuss these arguments in turn.

Defendant correctly asserts that the three-prong all events test set forth in § 461(h)(1), (4) applies broadly to the entire IRC.  *See* § 461(h)(1) ("For purposes of this title, in determining whether an amount has been incurred with respect to any item during any taxable year, the all events test shall not be treated as met any

---

[12]/  ...continue
It turns directly to the IRS's regulations and other pronouncements . . . .).

earlier than when economic performance with respect to such item occurs."); *see also* Def.'s Reply at 8, 11.  Defendant also asserts, correctly, that the all events test was codified in 1984 and that this new three-prong all events test contains no mention of or limitation with regard to deductions; rather, the test is to be applied to "any item."  *See* § 461(h)(1), (4).  Defendant notes that an earlier version of the all events test, found in Treas. Reg. § 1.461-1(a)(2) (1967), stated that "an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy."  Def.'s Reply at 12.  Because the new three-prong test does not contain language that might limit its applicability to deductions, defendant concludes that § 461(h) is of general applicability and that the three-prong all events test applies to cost basis determinations as well.

The court agrees with defendant's overall thesis that § 461(h) and its three-prong all events test, based on the plain language of the statute, is of general applicability and should be applied to determine when liabilities are incurred for the purpose of cost basis calculations.  The court has considered all of plaintiff's arguments to the contrary, and does not find them persuasive.  As previously noted, plaintiff's argument that § 1012 itself is determinative of when an assumed liability may be included in cost basis has no merit.  Plaintiff's argument that the location of § 461(h) in the Code is determinative of the scope of its application is defeated by IRC § 7806(b), which states in relevant part that "[n]o inference, implication, or presumption of legislative construction shall be drawn or made by reason of the location or grouping of any particular section or provision or portion of this title."  Similarly, the fact that the title of § 461 is "General rule for taxable year of deduction," is not determinative of the scope or meaning of § 461(h), which was added to § 461 in 1984.  *See, e.g.*, *Grapevine Imports, Ltd. v. United States*, 71 Fed. Cl. 324, 331 & n.6 (2006) (citing § 7806(b), and numerous other authorities, for the proposition that "[c]ase law makes amply clear that [§ 7806(b)] prohibits courts from relying on the heading of a [Code] section in construing the language therein").

Plaintiff also appears to suggests that if § 461(h) were to apply to a determination of cost basis, or adjusted cost basis, that application should be limited to taxpayers who construct plants, not to those who purchase them.  Pl.'s Mot. at 26-27, 32, 38; Pl.'s Reply at 36-37.  Plaintiff cites no authority for this proposition.  To the extent that this constructed asset vs. purchased asset argument is an extension of plaintiff's contention that the capitalization rules of § 263 should

not apply to the determination of § 1012 cost basis, the court cannot agree. *See supra* note 9. The court concurs with defendant that § 461(h) does not distinguish between constructed and purchased assets (and the liabilities related to such assets), and that plaintiff's contentions in this regard have no merit. Def.'s Reply at 7-10.

Finally, in plaintiff's reply brief, AmerGen sets forth for the first time an argument that the economic performance rule found in § 461(h)(1) cannot apply to cost basis because of certain unintended consequences to taxpayers using cash method accounting[13]:

> [I]f the government were correct about the economic performance rule being all encompassing, then liabilities assumed by a cash method taxpayer would also be affected. Non-contingent liabilities have always been included in purchase price for *all* taxpayers, including cash method taxpayers. The government's approach would suggest a delay in computing purchase price for cash method taxpayers. But the government has not seriously contended that the economic performance rule applies to cash method taxpayers in any respect. The government might argue that the economic performance rule is all-encompassing *within* the accrual method. But accrual method accounting is not relevant for determining purchase price or cost, and there is no sense in treating cash and accrual method taxpayers differently with respect to purchase price accounting. The inescapable consequence of the government's position that § 461(h) is not limited to the specific context of deductions for accrual method taxpayers would be either to change the rules for cash method taxpayers (a result never intended) or to treat accrual and cash method taxpayers differently when purchasing property (also

---

[13]/ This argument appears for the first time in plaintiff's reply brief, although a certain foundation is laid in plaintiff's opening brief. *See* Pl.'s Mot at 36 ("Purchase price and thus § 1012 basis are *not* functions tied to accrual methods of accounting. They are separate determinations, required of all taxpayers regardless of their accounting method.").

never intended).

Pl.'s Reply at 25-26.  Plaintiff cites no authority for this argument.  Because plaintiff raises this argument in its reply brief and defendant did not have an opportunity to respond to this argument, it is not proper for the court to opine on the question of whether the three-prong all events test in § 461(h) applies to cash method accounting taxpayers.  *See, e.g.*, *Extreme Coatings, Inc. v. United States*, 109 Fed. Cl. 450, 452 n.1 (2013) (stating that an argument raised for the first time in a reply brief is not properly before the court) (citations omitted).  Even if plaintiff's argument were properly before the court, it is not persuasive.  Nothing in the text of § 461(h) or § 1012 precludes the application of the economic performance rule to assumed liabilities in calculating the cost basis of an asset purchased by a taxpayer that, like AmerGen, uses accrual method accounting.  Indeed, such a use of the all events test (formerly a two-prong test and now a three-prong test) is well-established in caselaw, as described below.

Turning now to defendant's argument that IRC § 468A also supports its interpretation of § 461(h), the court agrees with plaintiff that no specific language in § 468A addresses the scope and applicability of the all events test in determining cost basis.  *See* Pl.'s Mot. at 43 ("There is no statutory support for the government's contention that § 468A has anything to do with § 1012 basis.").  The court recognizes that there is a certain logic to defendant's description of a comprehensive and coordinated scheme for the tax treatment of decommissioning liabilities enacted by Congress in 1984, but the plain text of sections 461(h) and 468A does not explicitly set forth that logic.  In the court's view, the text of § 461(h)(1), (4) adequately sets forth the three-prong all events test and the applicability of that test to cost basis determinations.

Both parties refer to additional Code sections in support of their reading of the three-prong all events test in § 461(h).  Defendant draws upon IRC § 172(f), also enacted in 1984, for its "special, extended loss carry-back rule for decommissioning liabilities."  Def.'s Mot. at 30 n.27; *see also* Def.'s Reply at 24-25.  Plaintiff relies upon IRC § 167, "a method for depreciating property under the 'income forecast' method," enacted in 1996.  Pl.'s Mot. at 31; *see also* Pl.'s Reply at 28 n.14.  The court finds none of these arguments availing.  Again, the plain text of § 461(h) is sufficient to determine the applicability of the three-prong all events test to cost basis determinations.  The court now considers other authorities to confirm its interpretation of the statutory text.

21

### 4.   Caselaw

There is no precedent binding on this court which explicitly addresses the question of the applicability of the three-prong all events test, now codified at § 461(h)(1), (4), to § 1012 cost basis. *See Transamerica Corp. v. United States*, 999 F.2d 1362, 1369 (Fed. Cir. 1993) ("The Government has cited no case that has applied the 'all-events' test governing the determination of deductibility of ordinary expenses under section 461 to the determination of what liabilities may be included in the cost basis for depreciation under section 1012."). Furthermore, the parties have not cited any cases from this court which have addressed this issue. *See* Pl.'s Mot. at 4 ("At bottom, the specific dispute here in Counts I-IV is a case of first impression for this Court . . . ."). The court therefore first considers whether caselaw applying the former two-prong all events test to cost basis provides support for the application of the modern three-prong test to cost basis.

As defendant argues, "[c]ourts had already been using the old two-pronged regulatory all-events test, or similar principles, to determine when assumed liabilities could be included in basis." Def.'s Reply at 15 (citations omitted). Plaintiff does not disagree that some sort of two-prong test was used, before 1984, to determine whether or not an assumed liability was contingent or non-contingent for the purposes of calculating cost basis. Pl.'s Reply at 26 n.13. The court has examined the authorities cited by defendant and finds that the two-prong all events test, prior to 1984, was properly used by courts to determine cost basis. *See, e.g.*, *Exxon Mobil Corp. v. Comm'r*, 114 T.C. 293, 313 (2000) (citing cases resolving disputes arising in pre-1984 tax years for the proposition that "[t]he all-events test also applies under section 1012 to the accrual into the tax bases of capital assets of estimated future capital costs"); *La Rue v. Comm'r*, 90 T.C. 465, 478-79 (1988) (stating, in a dispute arising in tax years prior to 1984, that "because an accrual basis partnership uses the 'all-events' test to determine when an expense is deductible, we think that test may be properly used to determine when the corresponding liability is includable in basis") (citations omitted). Thus, the rule applicable to the deduction of expenses was also applied to the inclusion of liabilities in cost basis. *See La Rue*, 90 T.C. at 478 ("This [all events cost basis] test is similar, if not identical, to the 'all-events' test for deduction of accrued expenses.").

From these cases, it is clear that an all events test is required to determine which assumed liabilities should be included in calculations of cost basis, and that

such a test has traditionally been found in the rules for the determining the appropriate tax year for expense deductions.  *See La Rue*, 90 T.C. at 478 (noting that "an expense is deductible for the taxable year in which all the events have occurred which determine the fact of liability and the amount thereof can be determined with reasonable accuracy," and extending that test to the determination of cost basis (citing *Hughes Properties*, *Anderson* and Treas. Reg. 1.461-1(a)(2))). Plaintiff's position in this litigation would suggest that after 1984, the all events test for cost basis (or the fixed and determinable test, in plaintiff's terms) must have been decoupled from the all events test for expense deductions.  There is no logic to plaintiff's position, and no support in either recent caselaw or treatises for such a position.

Although there is little discussion of the all events test and cost basis calculations in recent caselaw, at least two cases, albeit, perhaps, in *dicta*, confirm defendant's view that the all events test continues to serve in the determination of cost basis.  For example, in *Hutchinson v. Commissioner*, 116 T.C. 172, 187-88 (2001), the United States Tax Court commented that under "the general economic performance rule of section 461(g) and (h), . . . interest expense is not added to the bases of property until the expense is incurred."  In *United States v. ConocoPhillips Co.*, No. 4:11–cv–00071–JHP–TLW, 2012 WL 3646809, at *1-2, *4-5, *8-9 (N.D. Okla. Aug. 23, 2012), the court noted that claims for an increase in the cost basis of the Trans-Alaska Pipeline System for liabilities related to "Dismantling, Removal, and Restoration costs" would be subject to the economic performance requirements of § 461(h), unless an owner could benefit from special pre-1984 contract-based rights.  These cases, in the court's view, support defendant's position that the post-1984 three-prong all events test in § 461(h)(1), (4) applies to assumed liabilities and cost basis determinations.[14]

## 5.    Legislative History and Congressional Intent

---

[14]/ Defendant also cites a number of treatises that echo its position that the three-prong all events test is used to determine when a liability has been incurred for the purposes of determining cost basis.  *See* Def.'s Mot. at 21 n.18; Def.'s Reply at 22.  Plaintiff's response to these authorities is that "[t]hose secondary authorities merely restate the unsupported IRS conclusions and lack independent analysis."  Pl.'s Mot. at 41 n.14.  The court notes that plaintiff has failed to cite *any* secondary authority for its central contention that assumed liabilities, for the purpose of cost basis determinations, are not subject to the economic performance requirement of § 461(h)(1).

Although the court has found that the plain text of § 461(h) and caselaw support defendant's interpretation of the three-prong all events test and its applicability to cost basis, the court finds additional support in the legislative history of the Deficit Reduction Act of 1984 (Act).[15]  Both parties examine the legislative history of the Act.  Defendant cites a House Report which clearly explains, in a section titled "Premature Accruals" and subtitled "Reasons for Change," why § 461(h) was enacted:

> The committee believes that the rules relating to the time for accrual of a deduction by a taxpayer using the accrual method of accounting should be changed to take into account the time value of money.  Recent court decisions in some cases have permitted accrual method taxpayers to deduct currently expenses that are attributable to activities to be performed or amounts to be paid in the future.  Allowing a taxpayer to take deductions currently for an amount to be paid in the future overstates the true cost of the expense to the extent

---

[15]/  The United States Supreme Court has long counseled against recourse to legislative history when the text and meaning of a statute are unambiguous.  *See, e.g.*, *Gemsco, Inc. v. Walling*, 324 U.S. 244, 260 (1945) ("The plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction."); *United States v. Wiltberger*, 18 U.S. 76, 95-96 (1820) ("The intention of the legislature is to be collected from the words they employ.  Where there is no ambiguity in the words, there is no room for construction.  The case must be a strong one indeed, which would justify a Court in departing from the plain meaning of words . . . .").  Here, the court discusses legislative history primarily to address the parties' contentions regarding the purpose of § 461(h).  *See Darby v. Cisneros*, 509 U.S. 137, 147 (1993) ("Recourse to the legislative history . . . is unnecessary in light of the plain meaning of the statutory text.  Nevertheless, we consider that history briefly because both sides have spent much of their time arguing about its implications.").  In the alternative, the court's discussion of legislative history and congressional intent provides confirmation of its interpretation of § 461(h).  *See, e.g.*, *Unimed, Inc. v. Quigg*, 888 F.2d 826, 829 (Fed. Cir. 1989) (finding the text of a statute unambiguous, but nonetheless briefly examining legislative history and confirming that the purpose of the statute was not contravened by the court's interpretation of statutory terms); *Sims v. Dep't of Navy*, 711 F.2d 1578, 1580 (Fed. Cir. 1983) ("Even if we were to agree . . . that there is no apparent ambiguity in the words of [the statute at issue in that appeal], it would be appropriate to review the legislative history, as we have done here, to be certain of Congress' intent.").

the time value of money is not taken into account; the deduction is overstated by the amount the face value exceeds the present value of the expense.

The committee is concerned about the potential revenue loss from such overstated deductions. In many everyday business transactions, taxpayers incur liabilities to pay expenses in the future.  The committee believes that because of the large number of transactions in which deductions may be overstated and because of the high interest rates in recent years, the magnitude of the revenue loss may be significant.

Finally, the failure of present law to take into account the time value of money has become the cornerstone for a variety of tax shelters.  For example, a tax shelter partnership may obligate itself to pay someone to perform research and development in the future and claim a current deduction for the undiscounted amount of the costs to be incurred.

The committee recognizes that in the case of noncapital items, a taxpayer, theoretically, should be allowed a deduction for either the full amount of a liability when the liability is satisfied or a discounted amount at an earlier time.  However, the committee also recognizes that determining the discounted values for all kinds of future expenses would be extraordinarily complex and would be extremely difficult to administer. For instance, a system that allowed current deductions for discounted future expenses would have to include a complex set of rules for recalculating overstated and understated deductions when the future liabilities are reestimated or are actually satisfied at a time, or in an amount, different from that originally projected; a complex recapture mechanism would be required. Furthermore, in the case of capital items, an appropriate discounting system may be equally complex.  Therefore, in order to prevent deductions for future expenses in excess of their true cost while avoiding the complexity of a system of discounted valuation, the committee believes

> that expenses should be accrued only when economic
> performance occurs.

H.R. Rep. No. 98-432, pt. 2, at 1254-55 (1984).  This report also explains how the
new three-prong all events test works:

> If economic performance has occurred, the amount is
> treated as incurred for all purposes of the Code.  If
> amounts incurred are chargeable to a capital account or,
> under any other provision of the Code, are deductible in a
> taxable year later than the year when economic
> performance occurs then such other provisions apply in
> determining the amount deductible each year. . . .
> Economic performance with respect to a particular
> liability generally occurs when the activities that the
> taxpayer is obligated to do to satisfy the liability are
> actually performed.

*Id.* at 1255.  The court reads this House Report, first, to show Congress' concern
with the time value of money and revenue losses due to attempts by taxpayers to
claim the premature accrual of liabilities, as well as with the administrative
challenges of providing a system for the discounted valuation of liabilities that will
be satisfied in the future.  Second, and more importantly, Congress understood that
these concerns were present not only in the timing of deductions for expenses but
also in the timing of the accounting of liabilities relevant to capital items.

In its opening brief, plaintiff neatly side-steps the House Report and its
damaging revelation of congressional intent, and focuses instead on a Conference
Report also cited by defendant.  Pl.'s Mot. at 33.  The Conference Report is more
concise in its description of the purpose of § 461(h), but there is no substantive
difference in the Conference Report's explanation of the economic performance
requirement and the three-prong all events test:

> In general, the House bill provides that in
> determining whether an accrual method taxpayer has
> incurred an amount during the taxable year, all the events
> which establish the taxpayer's liability for such amount
> will not be deemed to have occurred any earlier than the

26

time when economic performance occurs.  If economic
performance has occurred, the amount will be treated as
incurred for all purposes of the Code.  Amounts incurred
are deductible currently only if they are not properly
chargeable to a capital account and are not subject to any
other provision of the Code that requires the deduction to
be taken in a taxable year later than the year when
economic performance occurs.

H.R. Rep. No. 98-861, at 871 (1984) (Conf. Rep.).  The Conference Report noted
that the agreed-upon bill "generally follows the House bill, with modifications."
*Id.* at 873.  In the court's view, both reports support defendant's interpretation of
§ 461(h), and the applicability of the three-prong all events test to assumed
liabilities as they might affect cost basis.[16]  Having considered all of the parties'
arguments as to legislative history, the court finds that this history reveals a
congressional intent consonant with the court's interpretation of § 461(h).

### 6.    Deference to Regulatory Implementation

Should the court have erred in its analysis of the plain meaning of the text of
§ 461(h), as well as in its interpretation of the statute in light of its legislative
history, the court considers whether, if § 461(h) could be considered to be
ambiguous, Treasury's regulatory implementation of § 461(h) and the three-prong
all events test is entitled to deference.  The parties correctly focus on whether
Treasury Regulations interpreting the three-prong all events test are entitled to
*Chevron* deference, under *Chevron U.S.A., Inc. v. Natural Resources Defense
Council, Inc.*, 467 U.S. 837 (1984).  Pl.'s Mot. at 36; Def.'s Reply at 30-33; Pl.'s
Reply at 37-39.  As the United States Court of Appeals for the Federal Circuit has
stated, "the Supreme Court confirmed that courts apply *Chevron* deference to
Treasury regulations" in appropriate circumstances.  *Dominion Res., Inc. v. United
States*, 681 F.3d 1313, 1317 (Fed. Cir. 2012) (citing *Mayo Found. for Med. Educ.
& Research v. United States*, 131 S. Ct. 704, 711-13 (2011)).  Generally, if a
statute is found to be ambiguous, a regulation interpreting the statute may be

---

[16]/  A third report relied upon by plaintiff, Staff of Joint Committee on Taxation, 98th
Congress, *General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984*,
JCS-41-84 (Dec. 31, 1984), largely tracks the other two reports and contains substantially the
same analysis of the purpose of § 461(h) and the functioning of the three-prong all events test.

accorded *Chevron* deference if the regulation is a permissible construction of the statute. *Id.* ("If the statute is silent or ambiguous, then [*Chevron*] step two determines whether the agency's answer [to the precise question at issue] is based on a permissible construction of the statute." (citing *Chevron*, 467 U.S. at 842-43)).

Defendant builds an excellent foundation for *Chevron* deference, noting, first, that Treasury has been granted authority to promulgate regulations to implement the IRC. Def.'s Mot. at 31 (citing IRC § 7805(a) and *Mayo Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704, 713 (2011)). The court finds additional support for defendant's contention regarding regulatory authority in the fact that § 461(h) itself contains a reference to the Secretary's power to promulgate regulations governing the application of the economic performance requirement of the three-prong all events test. IRC § 461(h)(2). Second, the government presents a historical perspective of the notice-and-comment rule-making which, in 1992, resulted in regulations which incorporate the three prong all events test and apply that test to liabilities that may be included in cost basis and other items:

> Pursuant to this authority, the Treasury Department, after issuing proposed regulations and receiving comments, promulgated, in 1992, the regulations implementing the new economic performance requirement and all-events test of § 461(h). T.D. 8408, 1992-1 C.B. 155 (1992). In the Treasury Decision, it explained that the regulations reflected the fact that § 461(h) was not limited to determining when "expenses" were "deductible," as was the old, regulatory all-events test, but instead applied to "any item" relating to a liability that is taken into account for any purpose under the Code. *Id.* at *12412. It also noted that the legislative history expressly described the application of the economic performance rules to capital items, that have a cost basis, as well as to noncapital expense items, that are immediately deducted. *Id.* And, given Congress's evident concern with the effects of the uneconomic acceleration of future liabilities, that could be taken into account as either capital items or noncapital expense items, the Treasury Department confirmed that the rules should apply generally to expenses, costs, basis

and deductions – all items through which accelerated
future liabilities could be prematurely taken into account.
To do otherwise, it further explained, would be
inconsistent with Congressional intent. *Id.* Amergen's
contention ([Pl.'s Mot.] at 36) that there was no relevant
"IRS analysis" when the regulations were issued is,
therefore, baseless.

Def.'s Reply at 31-32. The court notes that plaintiff's argument that § 461(h)
cannot be applied to cost basis determinations is discussed and soundly rejected by
the IRS in this final regulation notice, for the same reasons this court has rejected
plaintiff's arguments. *See* 1992-1 C.B. 155 at *12412 ("The Service and the
Treasury Department believe section 461(h) and its legislative history indicate that
Congress intended that rules of section 461(h) to apply to both exclusions
[applicable to cost basis and other calculations] and deductions.").

As for the text of the regulations, the court finds that the provisions relied
upon by defendant are straightforward applications of the three-prong all events
test set forth in § 461(h)(1), (4). One such regulation restates the modern all events
test:

Under an accrual method of accounting, a liability (as
defined in § 1.446-1(c)(1)(ii)(B)) is incurred, and
generally is taken into account for Federal income tax
purposes, in the taxable year in which all the events have
occurred that establish the fact of the liability, the amount
of the liability can be determined with reasonable
accuracy, and economic performance has occurred with
respect to the liability.

Treas. Reg. § 1.461-1(a)(2)(i). In another, the term "liability" is defined
consistently with § 461(h):

The term "liability" includes any item allowable as a
deduction, cost, or expense for Federal income tax
purposes. In addition to allowable deductions, the term
includes any amount otherwise allowable as a capitalized
cost, as a cost taken into account in computing cost of

> goods sold, as a cost allocable to a long-term contract, or
> as any other cost or expense.  Thus, for example, an
> amount that a taxpayer expends or will expend for capital
> improvements to property must be incurred before the
> taxpayer may take the amount into account in computing
> its basis in the property.

Treas. Reg. § 1.446-1(c)(1)(ii)(B).  In a third regulation promulgated in 1994, capital expenditures are identified as items subject to the economic performance rule, as required by § 461(h), in order to determine cost basis:

> [A] capital expenditure . . . is taken into account through
> inclusion in inventory costs or a charge to capital
> accounts or basis no earlier than the taxable year during
> which the amount is incurred within the meaning of
> § 1.446-1(c)(1)(ii).

Treas. Reg. § 1.263(a)-1(b) (1994); *see also* Treas. Reg. § 1.461-1(a)(2)(i) ("As a further example, under section 263 or 263A, a liability that relates to the creation of an asset having a useful life extending substantially beyond the close of the taxable year is taken into account in the taxable year incurred through capitalization (within the meaning of § 1.263A-1(c)(3)), and may later affect the computation of taxable income through depreciation or otherwise over a period including subsequent taxable years, in accordance with applicable Internal Revenue Code sections and guidance published by the Secretary.").  These regulations are both a "'permissible construction'" and a "reasonable construction" of § 461(h) and its three-prong all events test, and are thus entitled to *Chevron* deference.  *Mayo*, 131 S. Ct. at 712, 716 (quoting *Chevron*, 467 U.S. at 843).  As an alternative holding, this court would therefore accord *Chevron* deference to the regulations implementing § 461(h).  These regulations show that the three-prong all events test applies to assumed liabilities for the purposes of determining § 1012 cost basis.

Plaintiff's arguments against according *Chevron* deference to the regulations cited by defendant are not persuasive.  Plaintiff argues, for example, that the IRS did not "conduct[] the requisite statutory analysis entitling it to deference."  Pl.'s Mot. at 36.  The court disagrees because the IRS did analyze the text of § 461(h) and its legislative history.  AmerGen also states that "[t]he regulations do not

purport to apply to AmerGen's situation because they do not concern § 1012 basis." *Id.* The court must again disagree. As discussed *supra*, the referenced three-prong all events test must be used to determine whether a liability has been incurred so that it can be included in cost basis – such an all events test need not specifically cross-reference § 1012. Further, the regulations cited above show that the three-prong all events test in § 461(h) does apply to the cost basis dispute in this case, despite plaintiff's protestations to the contrary.

Plaintiff also mentions, in passing, "the well-established tools of statutory interpretation," but is not persuasive in its attempt to employ these tools to defeat *Chevron* deference to the regulations cited by defendant. Pl.'s Reply at 37; *see* Pl.'s Mot. at 35 (noting that "[a]ll statutory interpretation must begin with the Code's language"). The court has considered the *Chevron* analysis set forth in *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881-87 (Fed. Cir. 1998), which utilizes "traditional tools of statutory construction," *Chevron*, 467 U.S. at 843 n.9. If the plain text of § 461(h) could be considered to be ambiguous, the court finds nothing in these traditional tools of statutory construction or the arguments presented by plaintiff in this regard which would prevent *Chevron* deference from being applied here.

Finally, plaintiff raises one more argument against according deference to Treasury's view of § 461(h). For this argument, plaintiff appears to concede that the regulatory framework promulgated in the early 1990s is legitimate, but complains that the IRS has now imposed on plaintiff an interpretation of § 461(h) and its implementing regulations that is flawed:

> [T]he government seeks deference for its position under cases like *Mayo* . . . , on the ground that AmerGen is supposedly attacking the validity of several regulations. That is not what AmerGen has argued. The Code and regulations are straightforward and do not operate as the government contends. *If* the government maintains that there is an interpretation beyond the straightforward statutory and regulatory text, *then* this is not a case for administrative deference because the government's proposed interpretation cannot be squared with the text of the Code, the regulations, or the well-established tools of statutory interpretation.

Pl.'s Reply at 37 (citations to briefs omitted).

Plaintiff's final argument sets forth two principal contentions. The first contention is that the government has distorted the text and meaning of its regulations. *See, e.g.*, Pl.'s Reply at 36 ("The government . . . has distorted what the regulations actually say and mean."), 38-39 ("The government's analysis here . . . contradicts the very text of the statute and regulations that it supposedly is interpreting."); *see also* Pl.'s Mot. at 40 ("[A]n agency's interpretation of a statute does not control simply because the agency is charged with administering the statute.") (citation omitted). The second contention is that the government's interpretation of the three-prong all events test, as advanced in this suit, is merely a litigating position not worthy of deference. Pl.'s Reply at 38-39.

Neither of these contentions has merit. The government's interpretation of its own regulations, as presented in this suit, does not contradict the meaning of § 461(h) or its implementing regulations. The government's position, that the three-prong all events test applies to decommissioning liabilities in determining the cost bases of the three nuclear power plants, is fully consistent with § 461(h) and Treas. Reg. §§ 1.263(a)-1(b) (1994), 1.446-1(c)(1)(ii)(B), and 1.461-1(a)(2)(i). Furthermore, the government's position was not adopted during the course of this litigation – it has clearly been in place since the early 1990s. The court therefore must reject plaintiff's reliance on controlling authority which holds that, in some circumstances, this court need not defer to the agency's interpretation of its own regulations when that interpretation has been adopted during the course of litigation. *See* Pl.'s Reply at 38 (citing *Adair v. United States*, 497 F.3d 1244, 1252 (Fed. Cir. 2007)).

Deference, in this instance, is governed by the more general rule that "an agency's interpretation of its own regulation is entitled to a level of deference even 'broader than deference to the agency's construction of a statute, because in the latter case the agency is addressing Congress's intentions, while in the former it is addressing its own.'" *Abbott Labs. v. United States*, 573 F.3d 1327, 1330 (Fed. Cir. 2009) (quoting *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1363-64 (Fed. Cir. 2005)). In addition, "'[i]n the context of tax cases, the government's reasonable interpretations of its own regulations and procedures are entitled to particular deference.'" *Id.* at 1333 (quoting *Am. Express Co. v. United States*, 262 F.3d 1376, 1383 (Fed. Cir. 2001)). Applying these principles, the court defers to Treasury's interpretation of its regulations implementing the three-prong

all events test found in § 461(h).  For this additional, alternative reason, the court would concur with defendant's interpretation of its own regulations, and reject plaintiff's contrary views, if § 461(h) could be considered to be ambiguous.[17]

**D.    Economic Performance of Decommissioning Liabilities, Required for Such Liabilities To Be Included in the Cost Bases of the Nuclear Power Plants, Did Not Occur at the Time of Purchase**

Although there is certainly no lack of dispute as to whether AmerGen's decommissioning liabilities were fixed and determinable, so as to satisfy the first two prongs of the three-prong all events test, defendant correctly notes that it is the third prong of the all events test, the economic performance requirement, which clearly denies plaintiff the favorable tax treatment it seeks in this suit:

> [B]ecause all three prongs must be satisfied to take into account a liability for tax purposes, and the economic performance prong for the alleged decommissioning liabilities is not met as a matter of law, this Court can determine at this stage that the liabilities cannot be taken into account as of 1999 and 2000, and can grant summary judgment for the United States on Counts I-IV. AmerGen's failure to meet the economic performance requirement is dispositive.

Def.'s Mot. at 23 (citations omitted).  It is difficult to imagine how plaintiff could argue that there was economic performance of decommissioning liabilities in 1999 and 2000 when the purchase of the three nuclear power plants occurred.  All of the decommissioning activities described by plaintiff – decommissioning required by the NRC, spent nuclear fuel management and site restoration expenses – are described as occurring "[w]hen a nuclear power plant owner like AmerGen eventually closes its plant[s]."  Pl.'s Mot. at 7.  It is undisputed that none of the

---

[17]/  Plaintiff accuses defendant of advancing an interpretation of the modern three-prong all events test that would lead to absurd results.  *See* Pl.'s Mot. at 41-42.  This argument, exploring the rationality of AmerGen's business decisions in light of the tax treatment of decommissioning liabilities under § 461(h), is not persuasive.  The court agrees with defendant that the statutory and regulatory scheme at issue in this case meets basic rationality standards, because it "avoid[s] the acceleration of . . . future liabilities[] and the overstatement of their potential cost."  Def.'s Reply at 26.

three nuclear power plants at issue in this suit were closed, or were about to be closed, in 1999 or 2000.

Recognizing that the court might hold that § 461(h) applies to cost basis determinations, plaintiff weakly argues that economic performance of decommissioning liabilities *did* occur at the time of the purchase of the three nuclear power plants. Pl.'s Mot. at 44-47; Pl.'s Reply at 42-44. In support of this argument of last resort, plaintiff proffers a tortured construction of § 461(h) and various Treasury Regulations. Plaintiff first turns to IRC § 461(h)(2)(A), which states that economic performance is determined according to these principles:

> (A) *Services and property provided to the taxpayer* If the liability of the taxpayer arises out of –
> (i) the providing of services to the taxpayer by another person, economic performance occurs as such person provides such services,
> (ii) the providing of property to the taxpayer by another person, economic performance occurs as the person provides such property, or
> (iii) the use of property by the taxpayer, economic performance occurs as the taxpayer uses such property.

In plaintiff's view, decommissioning liabilities are addressed by § 461(h)(2)(A)(ii), "because the liabilities undeniably arose out of 'the providing of property [the generation businesses] to the taxpayer [AmerGen] by another person [the sellers].'" Pl.'s Mot. at 45 (alteration of the text of § 461(h)(2)(A)(ii) in original). The fundamental flaw in plaintiff's argument is that, in this case, it is not the seller who conditions the transfer of property with the assumption of certain liabilities, it is the NRC. It is not, therefore, the "providing of property to the taxpayer" by the seller which creates the liability.[18]

---

[18]/ AmerGen's citation to *ABC Beverage Corp. & Subsidiaries v. United States*, No. 1:07-cv-051, 2009 WL 198302, at *8 (W.D. Mich. Jan. 27, 2009) is unhelpful. The real estate transaction in that case has no parallels with the sale of a nuclear power plant and the question of when decommissioning liabilities are incurred. *See ABC Beverage Corp. & Subsidiaries v. United States*, 577 F. Supp. 2d 935, 936 (W.D. Mich. 2008) (stating, in an earlier phase of that litigation, that "[t]he central issues raised in the cross motions [for summary judgment] are whether Plaintiff, upon acquisition of property, can claim a business deduction for the portion of the total purchase price attributable to buying out an excessive lease and, if so, when Plaintiff is
continue...

As defendant notes, Def.'s Reply at 33-34, another provision in § 461(h)(2) governs the case of a purchaser who itself performs decommissioning of a nuclear power plant:

> (B) *Services and property provided by the taxpayer*  If the liability of the taxpayer requires the taxpayer to provide property or services, economic performance occurs as the taxpayer provides such property or services.

IRC § 461(h)(2)(B).  Defendant relies on a number of regulations and other authorities for its statutory interpretation, and the court finds these authorities far more persuasive than plaintiff's attempt to shoehorn this case into the terms of § 461(h)(2)(A)(ii).

Plaintiff curiously suggests that defendant relies, instead, on § 461(h)(2)(A)(i), Pl.'s Mot. at 45, perhaps because the government references "the hiring of a [decommissioning operations contractor (DOC)]" by AmerGen, Def.'s Mot. at 27.  It is true that the government acknowledges that decommissioning activities may be performed by AmerGen or by a contractor hired by AmerGen.  Def.'s Reply at 33-34.  This is a distinction without a difference, however.  Even if decommissioning liabilities were construed as arising from a contract formed between a DOC and AmerGen, economic performance would only occur when those contracted services are performed.  This scenario, where the liability arises out of "the providing of services to the taxpayer by another person," is governed by the principle that "economic performance [of such a liability] occurs as such person provides such services."  IRC § 461(h)(2)(A)(i).

Defendant provides examples of clean-up liabilities incurred in mining and drilling, and shows that these liabilities are not incurred, for tax purposes, until economic performance of clean-up occurs.  Def.'s Mot. at 27.  Plaintiff suggests that defendant's cited examples of the application of the economic performance rule should only apply to constructed facilities, not acquired facilities:

> The government likens these examples to decommissioning.  But the examples are inapt.  They involve taxpayers that actually constructed the facilities

---

[18]/ ...continue
entitled to take the deduction").

> to be cleaned up – not taxpayers like AmerGen that
> purchased the assets and assumed liabilities in connection
> with the purchase and receipt of property.

Pl.'s Mot. at 46.  The court does not find plaintiff's argument persuasive because no such distinction can be found within the text of § 461(h).[19]

The final argument presented in plaintiff's motion regarding economic performance is a strained interpretation of Treas. Reg. § 1.461-4(d)(5).  Pl.'s Mot. at 46-47.  As defendant notes, this provision relates to the tax treatment of liabilities for the *seller* of an asset, not the *purchaser* of an asset.  *See* Treas. Reg. § 1.461-4(d)(5) ("*Liabilities that are assumed in connection with the sale of a trade or business* – (i) *In general*.  If, in connection with the sale or exchange of a trade or business by a *taxpayer* . . . .") (emphasis added); Def.'s Reply at 37-39 & n.21.  The court agrees with defendant's conclusion that plaintiff's argument "is not supported by the regulation[]'s text or the Treasury Department's own explanation of its regulation."  Def.'s Reply at 37-38.  The court therefore rejects plaintiff's reliance on Treas. Reg. § 1.461-4(d)(5) as support for its contention that economic performance of decommissioning liabilities occurred at the time of AmerGen's purchase of the three nuclear power plants.

In plaintiff's reply brief, reference is made to Treas. Reg. § 1.461-4(d)(2)(i), as potential support for plaintiff's interpretation of IRC § 461(h)(2)(A)(ii).  Pl.'s Reply at 42.  This regulation, however, is of no more help to plaintiff than the text of the statute itself:

> (2) *Services or property provided to the Taxpayer* –(i) *In general*.  Except as otherwise provided in paragraph (d)(5) of this section, if the liability of a taxpayer arises out of the providing of services or property to the taxpayer by another person, economic performance occurs as the services or property is provided.

---

[19]/  Plaintiff's citation to the term "income-producing activities," employed by the Staff of the Joint Committee on Taxation in JCS-41-84, at 262, *see supra* note 16, does not persuasively support its argument that there is a distinction between builders and purchasers of nuclear power plants as to the application of the economic performance requirement.  Pl.'s Mot. at 46.  As defendant notes, both purchaser and builder incur liabilities when economic performance has occurred.  Def.'s Reply at 34-36 & n.20.

Treas. Reg. § 1.461-4(d)(2)(i).  Here, as stated *supra*, the liability arises not out of the *sellers'* provision of the nuclear power plants to AmerGen, but out of the NRC's decommissioning requirements.

Defendant identifies a different regulation, Treas. Reg. § 1.461-4(d)(4)(i), which addresses liabilities to provide services, a category of liabilities which is perfectly harmonious with decommissioning liabilities.  *See* Def.'s Reply at 33.[20] The text of the regulation states that:

> (4) *Services or property provided by the taxpayer* –(i) *In general*.  Except as otherwise provided in paragraph (d)(5) of this section, if the liability of a taxpayer requires the taxpayer to provide services or property to another person, economic performance occurs as the taxpayer incurs costs (within the meaning of § 1.446-1(c)(1)(ii)) in connection with the satisfaction of the liability.  See *Examples 1* through *3* of paragraph (d)(7) of this section.

Treas. Reg. § 1.461-4(d)(4)(i).  Defendant also cites one of the examples referenced in Treas. Reg. § 1.461-4(d)(4)(i) as being analogous to decommissioning liabilities, and this analogy (comparing a liability to dismantle a drilling platform to decommissioning liabilities related to the operation of a nuclear power plant) is indeed apt.  Def.'s Reply at 35 (citing Treas. Reg. § 1.461-4(d)(7) (Example 1)).  The court agrees with defendant that it is Treas. Reg. § 1.461-4(d)(4)(i), not Treas. Reg. § 1.461-4(d)(2)(i), that applies to decommissioning liabilities.[21]

---

[20]/ Defendant later cites Treas. Reg. § 1.461-4(d)(4)(ii) as well.  Def.'s Reply at 36.  The court agrees with plaintiff that Treas. Reg. § 1.461-4(d)(4)(ii) is not applicable here because it addresses barter transactions.  *See* Pl.'s Reply at 43.

[21]/ The court also rejects plaintiff's renewed contention that Treas. Reg. § 1.461-4(d)(5) applies to the economic performance of liabilities assumed by purchasers of nuclear power plants.  *See* Pl.'s Reply at 43-44.  Plaintiff alleges in its reply brief that there is an inconsistency between Treas. Reg. § 1.461-4(d)(2) and the government's interpretation of Treas. Reg. § 1.461-4(d)(5).  Pl.'s Reply at 44.  The court does not see any inconsistency between the general rule, set forth in Treas. Reg. § 1.461-4(d)(2), and the special rule that applies to the seller of a trade or business, set forth in Treas. Reg. § 1.461-4(d)(5).  Even if there were any inconsistency or ambiguity in the regulations, defendant cites two documents which present the

continue...

The court, having considered all of the parties' arguments, concludes that the decommissioning liabilities assumed by AmerGen as it purchased the three nuclear power plants did not meet the economic performance requirement at the time of purchase. For this reason, the three-prong all events test in IRC § 461(h) has not been satisfied, and plaintiff may not include decommissioning liabilities in the cost bases of the plants as of 1999 or 2000. Defendant is therefore granted summary judgment on Counts I-IV of the complaint.

## CONCLUSION

For all of the above reasons, the court grants defendant's motion for summary judgment and denies plaintiff's motion for summary judgment as these motions address Counts I-IV of the complaint. The parties have provided the court with some ambiguous guidance as to the entry of final judgment in this case, an ambiguity that is related to the parties' settlement of Count V. First, the parties state that "[t]he settlement of Count V will be incorporated in the final judgment to be entered by the Court." Joint Status Report of July 3, 2013, at 1. Second, the parties state that "[w]hen final judgment is entered, the parties will file a stipulation regarding the disposition of Count V." *Id.* (citing RCFC App. F, Rule 7(a)).

To clarify the final judgment procedures requested by the parties, the parties shall file a joint status report explaining the specific steps they believe are necessary to fully resolve the claims in all five counts of the complaint in accordance with this opinion and the settlement of Count V. The parties shall attach a draft order for the entry of judgment to the joint status report. Agreeing to the entry of such judgment neither signifies agreement with this court's findings and conclusions nor waives any arguments or rights the parties might otherwise have, nor, in particular, impacts any party's right to an appeal. This process shall not be employed to reargue or seek reconsideration of any of the points resolved by this court's findings and conclusions. If the parties cannot come to an agreement as to the terms of a draft order for the entry of judgment, the joint status report should fully explain the parties' positions and attach alternative versions of the draft order.

---

[21]/ ...continue

agency's view that Treas. Reg. § 1.461-4(d)(5) does not apply to the timing of the purchaser's economic performance of liabilities; the court would necessarily defer to the agency's reasonable interpretation of its own regulation. *See* Def.'s Reply at 38 (citing 1992-1 C.B. 155 at *12415), 39 n.21 (citing 2004-2 C.B. 665 at *55741).

Accordingly, it is hereby **ORDERED** that

(1)    Defendant's Motion for Summary Judgment, filed May 22, 2012, is **GRANTED**;

(2)    Plaintiff's Cross-Motion for Summary Judgment, filed June 19, 2012, is **DENIED**;

(3)    On or before **October 4, 2013**, the parties shall **FILE** a **Joint Status Report** requesting the entry of final judgment in this case, and attaching a proposed draft order for the entry of judgment disposing of this case;

(4)    In addition, on or before **October 4, 2013**, counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter.[22]

/s/ Lynn J. Bush            
LYNN J. BUSH
Judge

---

[22]/ Any dispute as to redactions of the parties' sealed filings shall be resolved at a future date.